AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No.    '24  MJ0160
Facebook account "Alonso Lares" with Facebook account ID 10006754367384 )
and URL: https://www.facebook.com/100006754367384 ("**Target Account 1**") )
 Facebook Account "Silvia Alvarado" with Facebook account ID )
100053811542946 and URL: https://m.facebook.com/people/Silvia- )
Alvarado/100053811542946/ ("**Target Account 2**")

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960, 963 | Importation of Controlled Substances |

The application is based on these facts:

See Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Matthew R Sanborn*
_____
*Applicant's signature*

HSI Special Agent Matthew Sanborn
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____January 18, 2024_____

_____
*Judge's signature*

City and state: _____San Diego, CA_____

Hon. Valerie Torres
_____
*Printed name and title*

## ATTACHMENT A

This warrant applies to information associated with the following Meta Platforms, Inc. accounts:

- Facebook account associated with Facebook ID 100006754367384 and URL https://www.facebook.com/100006754367384 ("**Target Account 1**")
- Facebook Account "Silvia Alvarado" with Facebook account ID 100053811542946 and URL: https://m.facebook.com/people/Silvia-Alvarado/100053811542946/ ("**Target Account 2")**

that is stored at premises owned, maintained, controlled, or operated by Meta

Platforms, Inc., a company headquartered at 1 Meta Way, Menlo Park, California,

94025.

## ATTACHMENT B

### I.      Service of Warrant

The officer or agent executing the warrant shall permit Meta Platforms, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer or agent.

### II.     Items Subject to Seizure

All subscriber and/or user information; all electronic mail; chat history; images; videos; text messages; Facebook Messenger communications; histories; activity logs and all other documentation showing the user's posts and other account activities; profile and profile information, including status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, groups, and networks of which the user is a member; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; information about the user's access and use of account applications; method of payment; detailed billing records; access logs, transactional data; and any other files associated with the following account:

- Facebook account associated with Facebook ID 100006754367384 and URL https://www.facebook.com/100006754367384 ("**Target Account 1**")
- Facebook Account associated with Facebook account ID 100053811542946 and URL: https://m.facebook.com/people/Silvia-Alvarado/100053811542946/ ("**Target Account 2")**

### III.    The search of the data supplied by Meta Platforms pursuant to this warrant will be conducted as provided in the "Procedures for Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited in time from **June 1, 2023 to December 4, 2023**, and to the seizure of:

    a.      Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, tending to discuss, establish, or further drug trafficking or conspiracies to commit the same;

    b.      Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, tending to

identify Oscar Alonso Lares Macias, "Azul," and any co-conspirators involved in the activities in III(a);

      c.      Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts;

      d.      All photos and videos tending to establish or further drug trafficking or conspiracies to commit the same, identifying potential co-conspirators, or providing context to any relevant communications, records, photos, or videos or received or sent in temporal proximity to any relevant electronic mail; and

      e.      Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters related to the criminal activity under investigation, including records that help reveal their whereabouts.

which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.

**Affidavit In Support of Application for Search Warrant**

I, Matthew Sanborn, a Special Agent with Homeland Security Investigations ("HSI"), being duly sworn, hereby state as follows:

**INTRODUCTION**

1.      This affidavit is in support of an application by the United States of America for a search warrant for Internet Service Provider Meta Platforms, Inc., to search for records and data in and related to the following electronic communication and social networking accounts (the "**Target Accounts**") (as described in Attachment A):

a.  Facebook account "Alonso Lares" with Facebook account ID 10006754367384 and URL:
    https://www.facebook.com/100006754367384 ("**Target Account 1**")

b.  Facebook Account "Silvia Alvarado" with Facebook account ID 100053811542946 and URL: https://m.facebook.com/people/Silvia-Alvarado/100053811542946/ ("**Target Account 2"**)

**BACKGROUND**

2.      I make this affidavit in support of an application for a search warrant for information associated with certain Facebook accounts that are stored at premises owned, maintained, controlled or operations by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. The affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the accounts.

3.      I am presently employed as a duly sworn Special Agent (SA) with United States Homeland Security Investigations (HSI), where I have worked since

2022. During my tenure as a Special Agent, I have successfully completed both the Criminal Investigator Training Program (CITP) and the HSI Special Agent Basic Training Program at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. I am presently assigned to the HSI San Diego Special Agent in Charge (SAC) office and have been since July of 2023.

4.      Prior to my tenure as a Special Agent, between 2019 and 2022, I worked as a Customs and Border Protection Officer (CBPO) at the San Ysidro Port of Entry in San Diego County, California. Prior to becoming a CBPO, between 2016 and 2018, I worked as a Georgetown City Police Officer in Georgetown County, South Carolina.

5.      During the course of my law enforcement career, I have been involved in investigations of numerous criminal offenses, including those offenses related to this current investigation.   Conservatively, I have participated in investigations involving illicit drug trafficking, ranging from street-level drug users and dealers to major distributors. These investigations have included the use of undercover agents; the analysis of toll records; physical surveillance; and the execution of arrest and search warrants. These investigations have also included the unlawful importation, possession with intent to distribute, and the distribution of controlled substances, the related laundering of currency and monetary instruments and conspiracies associated with criminal narcotics offenses. These investigations have resulted in state and federal prosecutions of individuals who have possessed, imported, or distributed controlled substances, including cocaine, fentanyl, heroin, methamphetamine, marijuana, and 3,4-Methylenedioxymethamphetamine (also known as MDMA, or Ecstasy), as well as the seizure of those illegal drugs and the proceeds from the sale of those illegal drugs. Additionally, throughout my various forms of employment, I have attended multiple instructional courses on narcotics including trainings in the identification and handling of suspected narcotics and recognition of persons under

the influence of controlled substances and alcohol, as well as, through my own personal experiences, speaking with drug users, arrestees and other law enforcement officers, became familiar with the various ways controlled substances are packaged, smuggled, transported, consumed, marketed, sold, and purchased; their various forms of paraphernalia, and their commonly associated slang and jargon.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.      Based on my training and experience and the facts set forth in this affidavit, there is probably cause to believe that violations of Titles 21 U.S.C. §§ 952, 960, and 963 (importation of controlled substances and conspiracy) have been committed by Oscar Alonso LARES MACIAS and others. There is probable cause to search the information described in Attachment A for evidence of these crimes and contrabands or fruits of these crimes, as described in Attachment B.

**Facts in Support of Probable Cause**

8.      In December 2023, Homeland Security Investigations (HSI) Special Agents initiated an investigation focusing on the narcotics smuggling activities involving multikilogram quantities of cocaine into the United States from Mexico utilizing chili paste to potentially mask the odor of the narcotics and to lubricate the narcotics to wedge into non-factory compartments, specifically in the front bumper and trunk of vehicles. Since February 2023, the initial targets have been comprised of narcotics load drivers that have been arrested for attempting to smuggle drugs for this Drug Trafficking Organizations (DTO).

9.      On December 3, 2023, at approximately 12:45 PM, at the San Ysidro, CA Port of Entry, CA (POE), A Customs and Border Protection Canine Enforcement

Officer (CBPO CEO) was assigned to pre-primary Canine Enforcement Team roving operations.

10.     While on roving pre-primary lanes, the CBPO CEO's assigned Narcotic/Human Detection Dog alerted to the bumper of a white Honda Civic with Baja California, Mexico plates (BGX740A). The CBPO CEO made contact with the driver of the vehicle, Oscar Alonso LARES Macias, a citizen of Mexico.

11.     Due to the positive alert received by the canine, the CBPO CEO called for assistance on his radio. Additional CBPOs responded to lane to escort LARES to a secure location and the vehicle was driven to the vehicle secondary for further inspection.

12.     In vehicle secondary, at approximately 1:07 PM, the CBPO assigned to operate the Z-Portal scanned the white Honda Civic. Results of the image scan showed anomalies in the front bumper of the vehicle. The vehicle was subsequently inspected, and CBPOs located and removed a total of 10 packages concealed within a non-factory compartment inside the front bumper. The packages were wrapped in plastic and coated in a red chili paste. The packages contained a white powdery substance that tested positive for cocaine.

16.     HSI Special Agents conducted a video and audio recorded interview of LARES. Post-arrest, LARES was advised of his Miranda rights, and elected to provide statements without a lawyer present. LARES denied knowledge of the narcotics in the vehicle.  LARES stated that he was to be paid $1,700 USD to cross the vehicle, meet up with a person in the United States, and have his vehicle loaded with currency. LARES stated he was going to be instructed where to go and who to meet with, and felt he would likely be going to Los Angeles, CA to deliver the vehicle.

20.     LARES stated he works under several "bosses." LARES stated that a few months ago, he responded to a Facebook advertisement, and later met the

4

recruiter "AZUL" (TN: Joel Osuna GUARDADO) at a party. "AZUL" told LARES that the job was to cross narcotics into the United States, and cross currency back to Mexico. LARES stated he told "AZUL" he was not interested in crossing narcotics in the U.S., and preferred to bring currency back to Mexico.

21.   LARES stated "AZUL" operates under a fake Facebook profile named "Silvia Alvarado," with a female in the profile picture. According to LARES, "AZUL" works under a man nicknamed "ROCKA." LARES stated "AZUL" works for the Ensenada Municipal Vehicle Department. LARES stated "AZUL" makes all the arrangements with the vehicles that are used, and indicated that the vehicle he used in the offense was originally brought from Guadalajara, Mexico. LARES stated that the vehicle had plates from Guadalajara and "AZUL" changed the plates through his Government department. LARES stated the vehicle he drove on the date of the offense belonged to his "bosses" and was provided to him with the registration under his name.

22.   LARES stated this was the first time he was going to bring back currency from the U.S. LARES stated "AZUL" told him the currency was going to be well-hidden within the vehicle, but LARES did not know exactly where. LARES stated he has crossed the vehicle about five times previously with his girlfriend, and had once driven the vehicle to Los Angeles, CA to see a baseball game. Per TECS crossing records, the vehicle was first crossed with the current license plate on June 24, 2023. LARES stated he was previously paid to cross the vehicle into the U.S. — he stated he was given $300 USD the first time he crossed, $400 USD for the second time, and $100 USD for the third time. LARES stated he did not drive the vehicle for about one month prior to the date of the offense, because "AZUL" told him the vehicle was under repair.

23.   LARES stated that on the date of the offense, he drove another one of "AZUL's" vehicles, a 2015 white Volkswagen Jetta, from Ensenada to Tijuana. He

5

met "AZUL" for breakfast in Tijuana, and "AZUL" then provided him with the white Honda Civic. They drove together to a mall near the border, and "AZUL" told him not to cross right away because another one of "their" vehicles was crossing into the U.S. After waiting, LARES took possession of the Honda Civic and drove it to the San Ysidro, CA Port of Entry.

27.     At approximately 6:25 PM, LARES placed a phone call to his girlfriend. During the call, LARES told her that they found drugs in the car, and that "they told me it was going to be the money thing."

28.     Based upon my experience and investigation in this case, I believe that LARES, as well as other persons as yet unknown, were involved in an on-going conspiracy to import methamphetamine or some other federally controlled substances. Based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, I know that LARES spoke to individuals, including "AZUL," utilizing this application via phone and spoke on the whereabouts as to where these narcotics should be dropped off and picked up. Based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via Facebook (or other form of communication) after his or her arrest to determine the whereabouts of drugs that are being transported. I therefore believe the communications between LARES, "AZUL," and other coconspirators on or around the date of LARES's arrest will be captured on the **Target Accounts**. I believe that the appropriate date range for the search of **Target Accounts** is from

6

June 1st, 2023 (near the date of recruitment, with the first crossing in "AZUL's vehicle on June 24, 2023), up to and including December 4th, 2023 (*i.e.*, the day after the events described in this affidavit).

29.   Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

30.   Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

31.   Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

32.   Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to

7

the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

33.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

34.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

35.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

36.   If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

37.   Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

38.   Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

39.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

40.   Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

41.   In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

42.   Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

43.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

44.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with

10

the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

46.    Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

47.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.

## CONCLUSION

48.    Based on the foregoing, I request that the Court issue the proposed search warrant.

49.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government

11

will execute this warrant by serving it on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

50.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

51.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## **REQUEST FOR SEALING AND PRECLUSION OF NOTICE**

52.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation. I addition, pursuant to Title 18, United States Code, Section 2705(b), it is requested that this Court order the electronic service provider to whom this warrant is directed not to notify anyone of the existence of this warrant, other than its personnel essential to compliance with the execution of this warrant until July 17, 2024, absent further order from this Court.

53.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Matthew R Sanborn*
_____
Matthew Sanborn
HSI Special Agent

12

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1 on January 18, 2024.

Hon. Valerie Torres
United States Magistrate Judge

13